IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, *et al.*, <br><br><br> Plaintiffs, <br><br> vs. <br><br> BODELL CONSTRUCTION COMPANY, *et al.*, <br><br><br> Defendants. | Case No. 20-cv-00288-DKW-WRP <br><br> **ORDER (1) GRANTING PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT, (2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT, AND (3) DENYING DEFENDANT BODELL CONSTRUCTION COMPANY'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## INTRODUCTION

The parties dispute whether Plaintiffs-Insurers have a duty to defend and

indemnify Defendant Bodell Construction Company as a result of alleged damages

incurred by owners of condominiums constructed and/or sold by Defendants.   The

parties' dispute centers on whether damages resulting from the installation of

allegedly defective "embedded straps" amounts to an "occurrence" under numerous

insurance policies issued by Plaintiffs.

Having reviewed the parties' briefing and evidentiary submissions, the Court

finds that Plaintiffs-Insurers are entitled to summary judgment with respect to

policies collectively referred to as the "Travelers Primary Policies" and the

"Travelers Excess Policies" in Plaintiffs' first motion for partial summary judgment (Dkt. No. 95) because the undisputed facts show that there has not been an "occurrence" as that term is defined in those policies.   However, the Court disagrees in part with Plaintiffs' interpretation and application of language in policies referred to as the "Phoenix Primary Policies" and the "Travelers Property Excess Policies" in Plaintiffs' second motion for partial summary judgment (Dkt. No. 97).   Therefore, as more fully set forth herein, Plaintiffs' first motion for partial summary judgment, Dkt. No. 95, is GRANTED, and their second motion for partial summary judgment, Dkt. No. 97, is GRANTED IN PART and DENIED IN PART. Bodell's cross-motion for partial summary judgment, Dkt. No. 116, is DENIED.

## **RELEVANT FACTUAL BACKGROUND**

**1.     The Insurance Policies**

St. Paul Fire and Marine Insurance Company ("St. Paul") issued two commercial liability policies to Bodell, as the named insured, effective September 30, 2003 to September 30, 2005 (collectively, "the St. Paul Policies").   Plaintiffs' Concise Statement of Facts in Support of First Motion for Partial Summary Judgment ("First PCSF") at ¶ 1, Dkt. No. 96; Bodell's Response to First PCSF at 1, Dkt. No. 117.   The Travelers Indemnity Company of America ("Travelers Indemnity") issued three commercial liability policies to Bodell effective September 30, 2005 to September 30, 2008 (collectively, the "Travelers Indemnity Policies").

First PCSF at ¶ 2; Bodell's Response to First PCSF at 1.   The Phoenix Insurance Company ("Phoenix") issued four commercial liability policies to Bodell effective September 30, 2008 to September 30, 2012 (collectively, "the First Phoenix Policies").   First PCSF at ¶ 3.   Phoenix also issued four more commercial liability policies to Bodell effective September 30, 2012 to September 30, 2016 (collectively, "the Second Phoenix Policies").   Plaintiffs' Concise Statement of Facts in Support of Second Motion for Partial Summary Judgment ("Second PCSF") at ¶ 1, Dkt. No. 98; Bodell's Response to Second PCSF at 1, Dkt. No. 119.[1]   Travelers Property Casualty Company of America ("Travelers Property") issued seven commercial excess liability insurance policies to Bodell effective September 30, 2005 to September 30, 2012 (collectively, "the First Travelers Excess Policies" and, with the St. Paul Policies, the Travelers Indemnity Policies, and the First Phoenix Policies, "the First Policies").   First PCSF at ¶ 4.   Travelers Property also issued three more commercial excess liability insurance policies to Bodell effective September 30, 2012 to September 30, 2015 (collectively, "the Second Travelers Excess Policies" and, with the Second Phoenix Policies, "the Second Policies").   Second PCSF at ¶ 3.

---

[1]The Court notes that, at least for the instant analysis, Bodell does not dispute any of the factual assertions made in the Second PCSF.   *See* Dkt. No. 119 at 1.   In addition, except in two instances, Bodell does not dispute any of the factual assertions made in the First PCSF.   *See* Dkt. No. 117 at 1.

The Travelers Indemnity Policies, the First Phoenix Policies, and the First Travelers Excess Policies provided that Travelers Indemnity, Phoenix, and Travelers Property would pay those sums that the insured became legally obligated to pay as damages because of "bodily injury" or "property damage."   First PCSF at ¶ 16, 26.[2]   The Travelers Indemnity Policies, the First Phoenix Policies, and the First Travelers Excess Policies further provided that insurance applied to bodily injury and property damage only if the same were caused by an "occurrence."   *Id*. at ¶ 17, 26.   The Travelers Indemnity Policies and First Phoenix Policies defined (1) "property damage" as "physical injury to tangible property" and "loss of use of tangible property that is not physically injured", and (2) "occurrence" as an "accident including continuous or repeated exposure to substantially the same general harmful conditions."   *Id*. at ¶¶ 18-19, 27-28.   The St. Paul Policies provided that St. Paul would "pay amounts any protected person is legally required to pay as damages for bodily injury or property damage that" "is caused by an event."   *Id*. at ¶ 21.   The St. Paul Policies defined (1) "property damage" as "physical damage to tangible property of others" and "loss of use of tangible property of others", and (2) "event" as "an accident including continuous or repeated exposure to the same general harmful conditions."   *Id*. at ¶¶ 22-23.

---

[2] With respect to the First Travelers Excess Policies, Travelers Property was responsible for the "ultimate net loss" in excess of the "applicable underlying limit" that an insured became obligated to pay.   First PCSF at ¶ 26.

The Second Policies provided that Phoenix and Travelers Property would pay those sums an insured became legally obligated to pay as damages because of "bodily injury" and "property damage."   Second PCSF at ¶¶ 16, 20.[3]   The Second Policies further provided that insurance applied to bodily injury or property damage only if the same were caused by an "occurrence."   *Id*. at ¶¶ 17, 20.   The Second Policies defined "property damage" as "physical injury to tangible property" and "loss of use of tangible property that is not physically injured."   *Id*. at ¶¶ 19, 22. The Second Policies excluded coverage for "'[p]roperty damage' to 'your work' arising out of it and included in the 'products-completed operations hazard.'" Policy Number DT-CO-0618C07A-PHX-12 at 1431, Dkt. No. 98-4;[4]  Policy Number DT-CO-0618C07A-PHX-13 at 1560, Dkt. No. 98-7; Policy Number DT-CO-0618C07A-PHX-14 at 1719, Dkt. No. 98-10; Policy Number DT-CO-0618C07A-PHX-15 at 1858, Dkt. No. 98-13; Policy Number DTSM-CUP-0618C07A-TIL-12 at 2369, Dkt. No. 98-15; Policy Number DTSM-CUP-0618C07A-TIL-13 at 2437, Dkt. No. 98-16; Policy Number DTSM-CUP-0618C07A-TIL-14 at 2518, Dkt. No. 98-18.   The Second Policies further provided that the above-mentioned exclusion did not apply "if the damaged

---

[3]With respect to the Second Travelers Excess Policies, Travelers Property was responsible for the "ultimate net loss" in excess of the "applicable underlying limit" that an insured became obligated to pay.   Second PCSF at ¶ 20.
[4]In citing directly to the Second Policies, the Court uses the bates numbering provided in the bottom right-hand corner of the pertinent exhibits, *i.e*., "TR001431."

work or the work out of which the damage arises was performed on your behalf by a subcontractor." *Id*.

The Second Policies also contained an "Amendment of Occurrence Definition for Subcontracted Work Property Damage" ("the Occurrence Amendment"). *Id*. at ¶¶ 18, 21. The Occurrence Amendment defined "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions" or "[a]n act or omission, including all related acts or omissions, that causes 'subcontracted work property damage.'" *Id*. The Occurrence Amendment defined "[s]ubcontracted work property damage" as "property damage" that "[i]s neither expected nor intended from the standpoint of the insured" and "[i]s to 'your work' arising out of it or any part of it…if the damaged work out of which the damage arises was performed on your behalf by a subcontractor." *Id*. The Second Policies define "your work" as "work or operations performed by you or on your behalf" and "materials, parts or equipment furnished in connection with such work or operations." *Id*. at ¶ 23.

The Second Phoenix Policies had a per occurrence limit of $1 million, while the Second Travelers Excess Policies had a per occurrence limit of $5 million. *Id*. at ¶¶ 2, 4; Sunstone's Response to Second PCSF at ¶¶ 2, 4, Dkt. No. 121. The Second Policies stated that limits of coverage applied separately to each consecutive annual period. Sunstone's Concise Statement of Facts in Opposition to Plaintiffs'

Second Motion for Partial Summary Judgment ("Second SCSF in Opp.") at ¶ 9, Dkt. No. 121; Plaintiffs' Response to Second SCSF in Opp. at ¶ 9, Dkt. No. 143.   The Second Phoenix Policies also contained an "Amendment – Non Cumulation of Each Occurrence Limit of Liability and Non Cumulation of Personal and Advertising Injury Limit" ("the Non-Cumulation Amendment").   Policy Number DT-CO-0618C07A-PHX-12 at 1454, Dkt. No. 98-5; Policy Number DT-CO-0618C07A-PHX-13 at 1586, Dkt. No. 98-8; Policy Number DT-CO-0618C07A-PHX-14 at 1745, Dkt. No. 98-11; Policy Number DT-CO-0618C07A-PHX-15 at 1881, Dkt. No. 98-13.   The Non-Cumulation Amendment provided that:

> If one 'occurrence' causes 'bodily injury' and/or 'property damage' during the policy period and during the policy period of one or more prior and/or future policies that include a commercial general liability coverage part for the insured issued by us or any affiliated insurance company, the amount we will pay is limited. This policy's Each Occurrence Limit will be reduced by the amount of each payment made by us and any affiliated insurance company under the policies because of such 'occurrence.'

*Id*.   Although not part of an amendment as in the Second Phoenix Policies, the Second Travelers Excess Policies contained materially identical language in their terms.   Policy Number DTSM-CUP-0618C07A-TIL-12 at 2371, Dkt. No. 98-15; Policy Number DTSM-CUP-0618C07A-TIL-13 at 2439, Dkt. No. 98-16; Policy

Number DTSM-CUP-0618C07A-TIL-14 at 2520, Dkt. No. 98-18.[5]   The

Non-Cumulation Amendment did not modify the Second Policies' provision that

limits of coverage applied separately.   Second SCSF in Opp. at ¶ 10; Plaintiffs'

Response to Second SCSF in Opp. at ¶ 10.

## 2.   <u>The Underlying Litigation</u>

In 2003, Bodell was hired by developer Defendant Sunstone Realty Partners

X LLC ("Sunstone") to be the general contractor for construction work on a

condominium project known as "Ali'i Cove" ("the Project").   Bodell's Concise

Statement of Facts in Support of Cross Motion for Summary Judgment ("BCSF") at

¶ 1, Dkt. No. 117; Plaintiffs' Response to BCSF at ¶ 1, Dkt. No. 133; Sunstone's

Concise Statement of Facts in Opposition to Plaintiffs' First Motion for Partial

Summary Judgment ("First SCSF in Opp.") at ¶¶ 1, 3, Dkt. No. 125.[6]   The Project

consisted of approximately 37 buildings and 1 recreation center that were

constructed over the course of four years.   Bodell's Concise Statement of Facts in

Opposition to Plaintiffs' Second Motion for Partial Summary Judgment ("BCSF in

Opp.") at ¶ 23, Dkt. No. 119; Plaintiffs' Response to BCSF in Opp. at ¶ 23, Dkt. No.

137.

---

[5]The only differences in the language are that the Second Travelers Excess Policies (1) reference prior or future "commercial excess liability (umbrella) insurance[,]" instead of commercial general liability coverage, and (2) add the word "other" to the final sentence of the language as follows: "under the *other* policies because of such 'occurrence.'"

[6]The Court notes that Plaintiffs did not file a response to Sunstone's concise statement of additional facts in opposition to the first motion for partial summary judgment.   Therefore, for purposes of the instant analysis, the Court deems the same as unopposed.

On August 14, 2015, the Association of Apartment Owners of Aliʻi Cove ("AOAO") filed an action against Sunstone ("the Underlying Litigation") in the First Circuit Court of the State of Hawaiʻi ("First Circuit Court").   First PCSF at ¶ 5; BCSF at ¶ 2.   The Complaint and First Amended Complaint ("FAC") in the Underlying Litigation asserted claims against Sunstone for product liability, breach of implied warranty, breach of express warranty, negligence, unfair business practices, and punitive damages.   First PCSF at ¶ 6.   The AOAO alleged that Sunstone developed, built, and sold condominium units using embedded straps that did not meet building codes, instead of bolting house frames to their foundation. First PCSF at ¶ 7; BCSF at ¶ 3.   The AOAO alleged that the embedded straps damaged the condominiums, rendered them unsafe due to the threat of hurricanes, and caused corrosion that resulted in cracks in the concrete foundations.   BCSF at ¶ 3; Plaintiffs' Response to BCSF at ¶ 3.   The AOAO demanded the replacement of the embedded straps and the repair of all defects.   First PCSF at ¶ 7; BCSF at ¶ 3.

On March 21, 2017, the AOAO filed a Second Amended Complaint ("SAC") against Sunstone, alleging numerous additional defects, which, although not specifically identified, were referenced as those included in the Preliminary Letter of Findings performed by an expert for the AOAO.[7]   PCSF at ¶ 8; BCSF at ¶ 6; SAC at ¶ 8, Dkt. No. 96-51.   Posard's Preliminary Letter of Findings ("the Posard

---

[7]The AOAO's expert was Posard Broek + Associates ("Posard").   SAC at ¶ 28, Dkt. No. 96-51.

Findings") identified numerous construction deficiencies beyond the embedded straps, including site conditions, structural issues, building envelope, roofing, general architecture, mechanical, plumbing, and electrical.   PCSF at ¶ 9; BCSF at ¶ 6.

Sunstone filed a Third-Party Complaint in the Underlying Litigation against various entities, including Bodell and Becerra Concrete Construction ("Becerra"). PCSF at ¶ 10; BCSF at ¶ 4.   The Third-Party Complaint alleged that Bodell oversaw the construction of the Project, including the installation of the embedded straps in all units of the Project.   PCSF at ¶ 11; BCSF at ¶ 6.   The Third-Party Complaint further alleged that the AOAO claimed that the embedded straps were the "direct and proximate cause" of extensive corrosion rendering the units of the Project unsafe.   BCSF at ¶ 4; Plaintiffs' Response to BCSF at ¶ 4.   The Third-Party Complaint also alleged that Becerra was the subcontractor responsible for concrete and masonry work, including work associated with setting the embedded straps. Third-Party Complaint at ¶ 15, Dkt. No. 96-52.

In March 2016, Sunstone tendered the defense of the Underlying Litigation to St. Paul, Phoenix, and Travelers Indemnity pursuant to policies issued to Bodell. PCSF at ¶ 12.   St. Paul, Phoenix, and Travelers Indemnity agreed to defend Sunstone under a full reservation of rights.   *Id*. at ¶ 13.   Also in March 2016, Bodell tendered the Underlying Litigation to its insurance carriers.   PCSF at ¶ 14;

BCSF at ¶ 8.   Two of Bodell's insurers, Phoenix and Travelers Indemnity, agreed to defend Bodell under a full reservation of rights.   PCSF at ¶ 15; BCSF at ¶ 8.

At some point, the Underlying Litigation was stayed pending the outcome of two arbitrations.   BCSF at ¶ 9; Plaintiffs' Response to BCSF at ¶ 9.   In one arbitration, the AOAO arbitrated its claims against Sunstone and, on April 29, 2020, a settlement was reached between them.   BCSF in Opp. at ¶ 15; Plaintiffs' Response to BCSF in Opp. at ¶ 15.   Sunstone and Steadfast Insurance Company ("Steadfast") funded the settlement.   First SCSF in Opp. at ¶ 10.[8]

The second arbitration involved Sunstone's claims against Bodell ("the Second Arbitration").   BCSF at ¶ 11; Plaintiffs' Response to BCSF at ¶ 11.   On June 18, 2021, an Arbitration Decision and Award ("the Award") was issued in the Second Arbitration in favor of Sunstone.   *Id*.; First SCSF in Opp. at ¶ 13.   The arbitrator relied on the Trinity Subrogation Response ("Trinity Response")[9] as a framework for identifying alleged defects, but did not differentiate between work done by subcontractors versus work done by Bodell.   BCSF at ¶ 11; Plaintiffs' Response to BCSF at ¶ 11.   The Trinity Response included 281 items of alleged defects, including deficiencies in window installations and shower assemblies. BCSF at ¶¶ 12, 14; Plaintiffs' Response to BCSF at ¶¶ 12, 14.   The Arbitration

---

[8]At all relevant times, Sunstone was insured by Steadfast.   First SCSF in Opp. at ¶ 2.
[9]Trinity ERD ("Trinity") was Sunstone's expert in the Underlying Litigation.   First SCSF in Opp. at ¶ 19.

Award listed numerous defects for which Bodell was responsible or partly responsible.   BCSF at ¶ 13; Plaintiffs' Response to BCSF at ¶ 13.[10]   Some of the alleged defects in the Project involved work performed by subcontractors.   *See* BCSF at ¶ 15; Plaintiffs' Response to BCSF at ¶ 15.

On January 10, 2022, the First Circuit Court confirmed the Award.   First SCSF in Opp. at ¶ 13.   On January 28, 2022, the First Circuit Court entered a money judgment in favor of Sunstone.   *Id*. at ¶ 15.

## **RELEVANT PROCEDURAL BACKGROUND**

On June 25, 2020, Plaintiffs St. Paul, Phoenix, Travelers Indemnity, and Travelers Property (collectively, "Plaintiffs") initiated this case by filing a Complaint against Defendants Bodell, Sunstone, and Steadfast (collectively, "Defendants").   Dkt. No. 1.   Plaintiffs seek a declaration that they owe no duty to defend or indemnify Bodell or Sunstone, as well as reimbursement from Bodell of fees and costs already incurred and any sums paid on Bodell's behalf related to the Underlying Litigation.

Defendants answered the Complaint, and Bodell and Sunstone filed Counterclaims against Plaintiffs.   Dkt. Nos. 18, 20, 23, 29.   In their Counterclaims, Bodell and Sunstone both seek a declaration that Plaintiffs have a duty to defend and

---

[10]In its factual statement, Bodell also states that the arbitrator relied on the Trinity Response in finding Bodell responsible for defects.   BCSF at ¶ 13.   However, the evidence to which Bodell cites does not support the statement.

indemnify related to the Underlying Litigation, Plaintiffs have no right to reimbursement, and Plaintiffs breached their duties of good faith and fair dealing. Dkt. Nos. 23, 29.

On January 20, 2022, Plaintiffs initiated the extensive briefing related to the pending motions for summary judgment with the filing of two separate motions for partial summary judgment.   Dkt. Nos. 95, 97.   In the first motion for partial summary judgment, Dkt. No. 95, Plaintiffs assert that they have no duty to defend or indemnify Defendants with respect to the Underlying Litigation under the First Policies.   In the second motion for partial summary judgment, Dkt. No. 97, Plaintiffs assert that (1) they have no duty to indemnify under the Second Policies for work "self-performed" by Bodell at the Project, (2) the "non-cumulation clause" in the Second Policies limits the money available for indemnity to a single policy limit, and (3) the costs for removal and replacement of defective work are not covered.   Plaintiffs also filed concise statements of facts in support of both motions. Dkt. Nos. 96, 98.

After setting Plaintiffs' motions for partial summary judgment for hearing, Dkt. No. 105, on March 24, 2022, Bodell filed a joint opposition and cross-motion for partial summary judgment with respect to Plaintiffs' first motion for partial summary judgment, and an opposition to Plaintiffs' second motion for partial summary judgment ("second opposition"), Dkt. Nos. 116, 118.   In its cross-motion

13

for partial summary judgment ("cross-motion"), Dkt. No. 116, Bodell claims that Plaintiffs have a duty to defend with respect to the Underlying Litigation. Bodell also filed concise statements of facts in support of its cross-motion and second opposition. Dkt. Nos. 117, 119. At the same time, Sunstone filed oppositions to both of Plaintiffs' motions for partial summary judgment. Dkt. Nos. 120, 123. Sunstone also filed concise statements of fact in support of its oppositions. Dkt. Nos. 121, 125.[11][12]

On April 1, 2022, Plaintiffs filed a catalogue of documents. In no particular order, Plaintiffs filed (1) a joint reply in support of its first motion for partial summary judgment and opposition to the cross-motion and substantive joinder to the cross-motion, Dkt. No. 132, (2) a reply in response to Sunstone's opposition to the first motion for partial summary judgment, Dkt. No. 138, (3) two replies in support of the second motion for partial summary judgment, Dkt. Nos. 135, 141, (4) concise statements of facts in response to Bodell's cross-motion and Bodell's opposition to the second motion for partial summary judgment, Dkt. Nos. 133, 137, (5) concise statements of facts in response to Sunstone's substantive joinder to the cross-motion and Sunstone's opposition to the second motion for partial summary judgment, Dkt.

---

[11]Sunstone also joined in Bodell's concise statement of facts in support of the second opposition, Dkt. No. 126, and filed a motion for substantive joinder with respect to the cross-motion, Dkt. No. 128. With no objection to the motion for joinder, the same is GRANTED.
[12]For its part, Steadfast filed a "qualified statement of no position" with respect to the first motion for partial summary judgment and joinders with respect to certain filings of Bodell and Sunstone. Dkt. Nos. 122, 124, 145.

No. 140, 143, and (6) multiple objections to evidence submitted by Bodell and Sunstone, Dkt. Nos. 134, 136, 139, 142.

On April 8, 2022, Bodell filed (1) a reply in support of the cross-motion, Dkt. No. 146, and (2) responses to two of Plaintiffs' evidentiary objections, Dkt. Nos. 147-148.   On the same day, Sunstone filed a reply in support of its substantive joinder to the cross-motion, Dkt. No. 149, and a concise statement of facts in support of its reply, Dkt. No. 150.[13]   With briefing apparently at a close, pursuant to Local Rule 7.1(c), the Court elected to decide the motions for partial summary judgment without a hearing, taking the same under advisement.   Dkt. No. 151.

Unperturbed by the close of briefing on the motions for partial summary judgment, however, on April 12, 2022, Plaintiffs filed yet more objections to evidence submitted by Bodell, Dkt. Nos. 152-153.   Not to be outdone, a day later, Bodell filed a response to Plaintiffs' objections, Dkt. No. 155, as well as an ex parte motion to shorten time for hearing on Bodell's proposed motion to file yet more evidence in this case, Dkt. No. 154.[14]

---

[13]Local Rule 56.1(e) provides that a movant may file a concise statement of facts in support of a reply in order to "respond only to those additional facts" made in a party's opposition to the underlying motion.   Sunstone's concise statement of facts, however, does not respond to any additional facts made by Plaintiffs; rather it simply adds more purported facts.   *See* Dkt. No. 150 at ¶¶ 1-2.   Therefore, the Court does not further consider Sunstone's concise statement of facts in support of its reply (Dkt. No. 150).

[14]The Court notes that, in litigating the motions for partial summary judgment, the parties have managed to turn a relatively uncomplicated matter—application of insurance policy language to events giving rise to a claim on said policies—into a procedural and document morass.   With respect to the objections, counter declarations, objections to counter declarations, and proposed

Briefing now has mercifully come to an end.   This Order therefore follows.

## <u>STANDARD OF REVIEW</u>

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim in the case on which the non-moving party has the burden of proof.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In contrast, when the moving party bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted…."   *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).   This means that the movant "must establish beyond controversy every essential element" of its claims.   *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation omitted).   In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party.   *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

---

motion to submit further declarations, the Court observes that none of the same have been relevant to the analysis to come *infra*.   Therefore, the ex parte motion to shorten time, Dkt. No. 154, is DENIED AS MOOT.

## INSURANCE COVERAGE PRINCIPLES

Ordinarily, "the insured has the burden to prove that a loss is covered under the terms of the insurance policy." *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawaii, Ltd.*, 875 P.2d 894, 909 n.13 (Haw. 1994). In doing so, the terms of the policy, including undefined terms, should be interpreted according to their "plain, ordinary, and accepted sense in common speech" unless a different meaning is intended. *Allstate Ins. Co. v. Pruett*, 186 P.3d 609, 617 (Haw. 2008). However, "because policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys," "they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer." *Id*. (quotation and citation omitted).

In addition, the duty to indemnify and the duty to defend an insured are separate and distinct. *Dairy Road Partners v. Island Ins. Co., Ltd.*, 992 P.2d 93, 107 (Haw. 2000). The duty to defend "rests on the *possibility* that coverage exists. This possibility may be remote but if it exists, the insurer owes the insured a defense." *Id*. (quotation and internal quotation omitted, emphasis in original). Further, "[a]ll doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured." *Id*. (quotation omitted). The duty to defend "is purely contractual and depends, in the first instance, on the language of the particular policy involved." *Id*. at 108 (quotation and internal quotation omitted).

The duty to indemnify does not rest on the possibility of coverage and "is owed to the insured for any loss or injury which comes within the coverage provisions of the policy, provided it is not removed from coverage by a policy exclusion." *Id*. (citation and quotation omitted).

## **DISCUSSION**

## I.   **First Motion for Partial Summary Judgment and Cross Motion**

The first motion for partial summary judgment, Dkt. No. 95, and the cross motion, Dkt. No. 116, address the series of insurance policies referred to herein as the First Policies.   With respect to coverage under the First Policies, the parties' dispute concerns whether an "occurrence" or "event," as defined in those policies, has taken place.[15]   According to Plaintiffs, there has been no occurrence or event under the First Policies because, in Hawai'i, those terms have been interpreted as not including construction defect claims such as the ones Plaintiffs contend have been asserted in the Underlying Litigation.   Bodell and Sunstone argue, among other things, that an occurrence or event has taken place because the Underlying Litigation involves both alleged damage to subcontractors' work and violations of pertinent

---

[15]Plaintiffs also argue that the Underlying Litigation does not concern damages for "bodily injury", "personal injury", or "advertising injury" as defined in the First Policies.   Dkt. No. 95-1 at 11-12, 20-22.   Neither Bodell nor Sunstone address these arguments in their responses to the first motion for partial summary judgment.   *See generally* Dkt. Nos. 116-1, 123.   Therefore, the Court finds Plaintiffs' arguments with respect to these matters to be undisputed for purposes of summary judgment and does not further address them herein.

building codes.[16]   Having reviewed the parties' briefing and the relevant case law, the Court agrees with Plaintiffs.   Specifically, in light of relevant case law in this jurisdiction, there is no possibility that an "occurrence" has taken place under the First Policies and, therefore, Plaintiffs do not have a duty to defend (or indemnify) Bodell with respect to the Underlying Litigation.

        As an initial matter, the contractual language at issue here, as it should be, is undisputed.   Essentially, the First Policies provide that Plaintiffs will pay those sums that Bodell is legally obligated or required to pay for property damage caused by an "occurrence" or "event."   The First Policies further provide that an occurrence or event is an "accident including continuous or repeated exposure to substantially the same general harmful conditions."[17]   The definition of occurrence and event is critical.   This is because numerous courts, both at the state and federal levels, have considered substantially the same language.   For example, the Hawaiʻi Supreme Court has explained that alleged property damage was not "accidental" under a policy where the damage was "part and parcel of the alleged acts…that resulted in the claims for breach of contract and fraud."   *Hawaiian Holiday Macadamia Nut Co., Inc. v. Indus. Indem. Co.*, 872 P.2d 230, 235 (Haw. 1994). Similarly, the Ninth Circuit has explained that contract and contract-based tort

---

[16]Bodell and Sunstone raise a myriad of additional arguments in their briefing related to these motions, which the Court shall also address *infra*.

[17]As mentioned above, the St. Paul Policies state "the same general harmful conditions[,]" rather than "substantially the same…."   No party suggests this alters the analysis, however.

claims do not give rise to an "occurrence" because "[a]llowing recovery for disputes between parties in a contractual relationship over the quality of work performed would convert [a commercial general liability] policy into a professional liability policy or performance bond." *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940, 949 (9th Cir. 2004).   More recently, courts in this District have reached similar conclusions.   In *Evanston Ins. Co. v. Nagano*, 891 F. Supp. 2d. 1179, 1194 (D. Haw. 2012), the court found that construction contract claims and claims that arose from the construction contract were not occurrences within the meaning of commercial general liability policies and, thus, the insurer did not owe a duty to defend or indemnify the insured.[18]

The state of the law, therefore, is clear with respect to the meaning of "occurrence" or "event" as those terms are defined in the First Policies: contract claims and claims that arise from the contract are not covered.   In fact, neither Bodell nor Sunstone contend otherwise.   These defendants instead raise issues unrelated to the coverage language of their policies.   First, they assert that allegations in the Underlying Litigation of building code violations do not constitute a contract or contract-based claim.   Second, they assert that Bodell's alleged work

---

[18]*See also State Farm & Cas. Co. v. GP West, Inc.*, 190 F. Supp. 3d 1003, 1015-18 (D. Haw. 2016); *Nautilus Ins. Co. v. 3 Builders, Inc.*, 955 F. Supp. 2d 1121, 1135-37 (D. Haw. 2013); *Illinois Nat'l Ins. Co. v. Nordic PCL Constr., Inc.*, 870 F. Supp. 2d 1015, 1032 (D. Haw. 2012) (all same).

may have caused damage to the work performed by its subcontractors, which constitutes an occurrence.   The Court addresses each argument in turn.

First, Bodell and Sunstone argue that, because the Underlying Litigation includes allegations that building codes were violated and, under Hawaiʻi law, violations of building codes can support a negligence claim independent of a contract, the building code allegations are an occurrence under the First Policies. Dkt. No. 116-1 at 20-22; Dkt. No. 123 at 8-12.   Bodell and Sunstone, however, read too much into the case upon which they rely.   That case—*Ass'n of Apartment Owners of Newtown Meadows v. Venture 15, Inc.*, 167 P.3d 225 (Haw. 2007)—involved an Association of Apartment Owners suing the developer, contractor, and subcontractors, among others, of an alleged, defectively constructed condominium project.   *Id*. at 238.   In other words, the case did *not* involve an insurance company either as a plaintiff or defendant or even the construction of the terms of an insurance policy.   Therefore, while it is true that *Newtown Meadows* held that "a homeowner may pursue a negligence claim against a builder where it is alleged that the builder has violated an applicable building code," *id*. at 288, the Hawaiʻi Supreme Court was not faced with (and, thus, did nothing to change) the issue of when an occurrence takes place pursuant to language like that here in the First Policies.   As another court in this District has explained, that issue is determined by whether the claims in the Underlying Litigation are premised upon a

contract or are contract-based.   *See State Farm Fire & Cas. Co. v. GP West, Inc.*, 190 F. Supp. 3d 1003, 1020 (D. Haw. 2016).

Here, other than mechanically asserting that violations of building codes constitute an independent tort, Bodell and Sunstone fail to explain *wh*y any of the allegations and claims of the Underlying Litigation actually constitute such an independent tort.   There is good reason.   The Underlying Litigation involves claims for product liability, breach of implied warranty, breach of express warranty, negligence, and unfair business practices.   The claims for breaches of implied or express warranty are clearly contractual.   *See Au v. Au*, 626 P.2d 173, 180 (Haw. 1981) ("A warranty results from the contractual relationship existing between the parties.").   As for the remaining claims, the allegations of the Underlying Litigation reflect that they are contract-based because they are all premised on Sunstone or Bodell's contractual undertakings to build homes in the Ali'i Cove subdivision in Kona, Hawaii.   This is true even of the allegation that the use of embedded straps violated building codes, given that such codes applied to Sunstone and/or Bodell due to their contractual undertakings.   *See State Farm*, 190 F. Supp. 3d at 1020 ("Here, any duty that Defendants had to perform all work and provide all services in

accordance with the state and local statutes, ordinances, and regulations, arose out of the parties' contract and subcontract....") (quotation omitted).[19]

Second, Sunstone argues that damages Bodell caused to the work of others, like subcontractors, constitutes an occurrence under the First Policies, citing the Ninth Circuit's decision in *Burlington*. Dkt. No. 123 at 6-8. However, again Sunstone reads too much into the case law−this time passing dicta in *Burlington*. Sunstone cites *Burlington* for the proposition that insurance "'coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products.'" *Id*. at 7 (quoting *Burlington*, 383 F.3d at 948). Context is important, though, and, here, immediately before the above-quoted sentence, the Ninth Circuit explained that "[t]he risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer." *See id*. In light of the conclusions and result of *Burlington*,[20] it would be curious for the Ninth Circuit to have essentially gutted the foregoing in the construction context by making an exception for any work performed by a subcontractor, which is the meaning

---

[19]To the extent the district court in *Submetering Sys., Inc. v. Fairmont Premier Ins. Co.*, 2008 WL 11345945 (D. Haw. Sep. 29, 2008), reached a different result, *see id*. at *2-4, this Court disagrees with the same.

[20]Among those conclusions, incidentally, is the Ninth Circuit's pre-*Newtown Meadows'* determination that even construction defect claims focusing on violations of local building codes do not result in coverage under a CGL policy. *Burlington*, 383 F.3d at 945-949.

Sunstone derives from this passage.   There is simply no case law from Hawaiʻi or the Ninth Circuit to which Sunstone cites that would support such a conclusion.

The Court turns now to myriad other arguments Bodell and/or Sunstone raise in their collective attempt to defeat the first motion for partial summary judgment. Bodell argues that, through a report written by an expert Plaintiffs hired, Plaintiffs "conceded" the existence of covered claims under the First Policies.   Dkt. No. 116-1 at 9.   Bodell and Sunstone also argue that, in tendering payment to Sunstone, Plaintiffs have "tacitly admitted" liability.   *Id*. at 9-10; Dkt. No. 123 at 18.   These arguments are specious at best.   With respect to the expert Plaintiffs hired, Bodell focuses upon a term, "Resultant Damages," that the expert was hired to render an opinion upon.   Bodell provides no explanation, though, of how any such opinions are relevant to the existence of a covered claim under the First Policies.   Those policies certainly do not provide that a claim is covered if an expert opines that "Resultant Damages" have taken place.   Rather, a claim is covered if, *inter alia*, there is a previously discussed "occurrence."   As for tendering payment to Sunstone, neither Bodell nor Sunstone explain how this is relevant to the First Policies.   Notably, there is no evidence cited indicating that any such payment was tendered pursuant to the First Policies, nor the reason for such tender.

In a similar vein, Bodell and Sunstone argue that policy language and/or a letter from Plaintiffs mean that Plaintiffs must provide coverage or are sufficiently

ambiguous to be construed against Plaintiffs.   Dkt. No. 116-1 at 10-12; Dkt. No. 123 at 14-16.   Bodell and/or Sunstone also argue that "rip and tear" damages are covered under the First Policies and it is disputed *when* damage to the Project occurred.   Dkt. No. 116-1 at 13-17; Dkt. No. 123 at 16-18.   None of these arguments, though, address the critical question here: whether there has been an occurrence under the First Policies.   Put simply, if there has been no occurrence, there is no coverage under the First Policies, no matter the ambiguity (or lack thereof) in other policy language.

Bodell next argues that, in their reservation of rights letter, Plaintiffs failed to reserve rights with respect to the St. Paul Policies, the First Travelers Excess Policies, and the Second Travelers Excess Policies.   Dkt. No. 116-1 at 17-20. What is more accurate is that St. Paul and Travelers Property have not issued a reservation of rights letter to Bodell at all.   Thus, while, technically, St. Paul and Travelers Property have not formally reserved rights with respect to any matter, they have also not waived any of their rights, which is the important point in this regard. Moreover, Bodell cites to no case law indicating that St. Paul and Travelers Property were required to issue a reservation of rights letter.   Therefore, the Court rejects this argument.

Sunstone also argues that Plaintiffs have failed to properly investigate the claims against Bodell.   Dkt. No. 123 at 6.   Other than making this bald assertion,

with no citation to evidence in the record, however, Sunstone provides no explanation as to how it is relevant to any matter raised in any of the pending motions.   Therefore, the Court does not further address it.   Sunstone next argues that Plaintiffs have "misplaced" their reliance on "pre-2012 policies" because there is no evidence that the AOAO's damages were sustained during that period.   *Id*. at 12.   Sunstone similarly argues that "each of the disputed policies are potentially triggered" because there is no evidence of when property damage occurred.   *Id*. at 16-18.   However, as Plaintiffs assert, these arguments miss the point of the first motion for partial summary judgment−to determine whether there is coverage under the First Policies.   *See* Dkt. No. 138 at 10.   In other words, when a claim may have arisen is irrelevant if the claim, even if falling within a policy period, would not be covered under the relevant policy.[21]

In summary, for the reasons discussed *supra*, the Court finds that Plaintiffs have carried their burden of showing an absence of genuine material fact with respect to the lack of coverage under the First Policies and, thus, Plaintiffs are entitled to summary judgment and Bodell and Sunstone are not in that respect.

---

[21]Both Bodell and Sunstone also argue that there is coverage under the Occurrence Amendment. Dkt. No. 116-1 at 12-13; Dkt. No. 123 at 12-14.   Given that the Occurrence Amendment exists only in the Second Policies, however, this argument relates to the second motion for partial summary judgment, and is, thus, addressed below.

II.     **Second Motion for Partial Summary Judgment**

In the second motion for partial summary judgment, Dkt. No. 97, Plaintiffs seek various declarations with respect to the Second Policies, in particular concerning whether there has been an "occurrence" and whether the Underlying Litigation involves a "single occurrence" under those policies.   Unlike the First Policies, however, the Second Policies contain an amended definition of "occurrence"—as specifically set forth in the Occurrence Amendment.   The Court disagrees in part with Plaintiffs' construction of that amendment and with Plaintiffs' application of the Non-Cumulation Amendment (and similar language in the Second Travelers Excess Policies).   As more fully set forth below, the second motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

A.     **Occurrence Amendment**

As set forth in the undisputed facts *supra*, the Second Policies contain an Occurrence Amendment.   That amendment contains a definition of "occurrence" different than the one in the First Policies discussed above.   In *one* respect, the definition remains the same: "occurrence" still means "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions[.]"   As a result, Plaintiffs again seek summary judgment with respect to the foregoing language on the same principal grounds as the first motion.   *See* Dkt. No. 97-1 at 12-14.   To the extent Bodell or Sunstone raise arguments in this regard,

they too are no different than the ones discussed earlier. *See* Dkt. No. 118 at 13-16. Therefore, with respect to this part of the definition of "occurrence" in the Second Policies, the Court reiterates the findings *supra* and finds that there is no coverage under the Second Policies.

The Occurrence Amendment, however, contains a new piece to the definition of the term "occurrence". That new piece is: "[a]n act or omission, including all related acts or omissions, that causes 'subcontracted work property damage.'" The Occurrence Amendment also defines "[s]ubcontracted work property damage" as "property damage" that "[i]s neither expected nor intended from the standpoint of the insured" and "[i]s to 'your work' arising out of it or any part of it…if the damaged work out of which the damage arises was performed on your behalf by a subcontractor."

Plaintiffs argue this language means that the Second Policies only provide coverage for property damage "caused by construction work by Bodell's subcontractors[,]" rather than "work self-performed by Bodell" at the Project. Dkt. No. 97-1 at 15. This Court disagrees. Notably, while Plaintiffs appear to focus their attention upon work "performed on your behalf by a subcontractor[,]"[22] they overlook the opening words of the additional definition of "occurrence" --

---

[22]In fact, other than quoting language from the Second Policies, Plaintiffs provide no meaningful explanation as to why the Court should accept their construction of the Occurrence Amendment. *See* Dkt. No. 97-1 at 14-15.

specifically, the words "[a]n act or omission…."   The phrase "act or omission" is

unencumbered by any of the limiting language that Plaintiffs appear to believe

should exist in order for the definition to not include work self-performed by Bodell.

Rather, a plain and ordinary reading of the words "[a]n act or omission" quite easily

could include an act or omission committed by or at the direction of Bodell that then

"causes subcontracted work property damage."   Therefore, the Court rejects

Plaintiffs' argument that, as defined in the Occurrence Amendment, an "occurrence"

under the Second Policies could not include work self-performed by Bodell.

### B.   Non-Cumulation Amendment

#### 1.   Interpretation

Plaintiffs argue that the Non-Cumulation Amendment (and similar language

in the Second Travelers Excess Policies)[23]  means that, if the same occurrence causes

property damage in multiple policy years, the amount of money that will be paid out

with respect to such an occurrence is limited.   Dkt. No. 97-1 at 16-20.   Plaintiffs

base this argument on the following (or substantially similar) language:

> If one 'occurrence' causes 'bodily injury' and/or 'property damage'
> during the policy period and during the policy period of one or more
> prior and/or future policies that include a commercial general liability
> coverage part for the insured issued by us or any affiliated insurance
> company, the amount we will pay is limited. This policy's Each
> Occurrence Limit will be reduced by the amount of each payment made

---

[23]For ease of reference and word economy, going forward the Court shall refer to the
Non-Cumulation Amendment and similar language in the Second Travelers Excess Policies as the
Non-Cumulation Amendment.

by us and any affiliated insurance company under the policies because of such 'occurrence.'

The Court agrees that this language is clear and, assuming that property damage over multiple policy periods involves just "one occurrence," which is discussed in more detail below, the amount paid on each policy is "limited."   This is because it is precisely what the policy language says: if there is "one occurrence" that causes damage during multiple policy periods, "the amount we will pay is limited."   The language then goes on to clearly provide by how much payment will be limited: the "Each Occurrence Limit"[24] will be reduced by the amount of each payment made under other policies because of the same occurrence.   For example, if $200,000 has been paid for one occurrence under one of the Second Phoenix Policies, then the $1 million occurrence limit for a different Second Phoenix Policy becomes $800,000 for the same occurrence.[25]

Bodell and Sunstone argue otherwise, principally claiming that, if the amount paid under the Second Policies is limited, the policies are "illusory" or "meaningless."   *See* Dkt. No. 118 at 17-18; Dkt. No. 120 at 7-11.   This Court disagrees.   Notably, simply because the amount paid out for a *single* occurrence is limited does not render the premiums Bodell paid for the Second Policies

---

[24]The parties do not dispute that the Second Phoenix Policies and the Second Travelers Excess Policies have a per occurrence limit of $1 million and $5 million, respectively.   *See* Dkt. No. 98 at ¶¶ 2, 4; Dkt. No. 119 at 3; Dkt. No. 121 at ¶¶ 2, 4
[25]In other words, $1 million (the Each Occurrence Limit) minus $200,000 (the amount of each payment made under other policies) equals $800,000 (that is still available).

meaningless because the Second Policies would still provide coverage for any other occurrence that may take place thereunder.   In other words, if Occurrence A exhausts the occurrence limit under Policy A (and also, therefore, for subsequent policy years), this does not mean that Policy B will provide an insured with no (or "meaningless") coverage for Occurrences B, C, D, E, F, G, etc.   It simply means that Policy B will provide no further coverage for Occurrence A.   There is, thus, nothing "meaningless" about the coverage provided by the Second Policies.[26]

The Court further disagrees with Sunstone's argument that other language in the Second Policies suggests a different interpretation of the Non-Cumulation Amendment.   Merely because the section on limits of liability provides that the limits "apply separately to each consecutive annual period", *see* Dkt. No. 120 at 9-10, does not mean that, each year, the policy limits essentially start afresh, at least not for a single occurrence.   In fact, Sunstone provides no meaningful explanation for why this language indicates the "discrete nature" of the Second Policies.   *See id*. at 10.[27]   This is particularly so in light of the clear meaning of the Non-Cumulation Amendment, which specifically references other policies.   Therefore, the Court

---

[26]Both sides cite cases, such as *Karen Kane Inc. v. Reliance Ins. Co.*, 202 F.3d 1180 (9th Cir. 2000) and *The Arc in Haw. v. DB Ins. Co., Ltd.*, 2021 2481672 (D. Haw. Jun. 17, 2021), 2021 WL 2481672 (*see* Dkt. No. 97-1 at 18, Dkt. No. 120 at 7-8), that involve language entirely different to the language at issue in this case.   Therefore, the Court takes no guidance or direction from those cases.

[27]Moreover, the case Sunstone cites in this regard, *A.B.S. Clothing Collection, Inc. v. Home Ins. Co.*, 34 Cal. App. 4th 1470, 1479 (Cal. Ct. App. 1995), involves an entirely different non-cumulation provision.

rejects this argument and grants the second motion for partial summary judgment to the extent set forth in this Section II(B)(1).

      2.    **Application**

Plaintiffs next argue that the Underlying Litigation involves only a single or one occurrence.   Dkt. No. 97-1 at 20-23.   According to Plaintiffs, this is so because the damages at issue "arose from a single Project, at a single site, pursuant to Bodell's single construction agreement…."  *Id*. at 23.   While the record reflects that the damages at issue here arose from a single Project, the Court cannot agree that the myriad alleged deficiencies in the Project's construction that underlie those damages constitute but one occurrence.   Notably, it is alleged in the Underlying Litigation that there may be up to *281* alleged defects, including deficiencies as varied as biological growth, improper window installations and shower assemblies, cracked concrete, downspout inversions and loose guardrails.   Plaintiffs provide no explanation why discrete deficiencies, such as these and more, as set forth in the Posard Findings, should all be grouped into one giant bucket constituting one occurrence.   This is particularly so given that insurance contracts in Hawaiʻi are meant to be interpreted by their "accepted sense in common speech" and "construed in accordance with the reasonable expectations of a layperson."  *See Allstate Ins.*, 186 P.3d at 617.   Put simply, the Court cannot comprehend how a layperson with reasonable expectations would construe "one occurrence" to mean 281 alleged

defects in the construction of a condominium project and even more so when those alleged defects do not involve the same deficiency or field.    To the extent Plaintiffs cite cases that they believe support their interpretation of the Second Policies in this regard, *see* Dkt. No. 97-1 at 22, the Court notes that they are not binding and/or offer no persuasive guidance.[28][29]

## III.    Plaintiffs' Final Argument

In the final pages of the second motion for partial summary judgment, Plaintiffs assert that they "owe no duty to indemnify for deficiencies in the work performed by subcontractors or for their failure to comply with code requirements." Dkt. No. 97-1 at 23.    Citing cases, Plaintiffs go on to state that property damage requires physical injury or loss of use, and then that the cost of repair or correcting an insured's defective work is not property damage.    *Id*. at 24.    That is it.    While Plaintiffs may understand the argument they are making, the Court does not.    If they are arguing that there has been no property damage in this case, they cite no evidence

---

[28]For example, in *Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 41 F.3d 429, 432 (9th Cir. 1994), the district court found that the "underlying cause of the plaster pitting was GLC's failure to warn end-users that high-periclase lime was unsuitable for indoor use."    The district court then found that the failure to warn was the singular occurrence under the parties' insurance policies, a result the Ninth Circuit affirmed.    *Id*.    Other than "Bodell's single construction agreement," Plaintiffs cite no such singular cause for the myriad alleged deficiencies at issue in the Underlying Litigation.    And this Court does not find the construction agreement, an extraordinarily generalized source for the cause of the Underlying Litigation, to be a singular cause or occurrence here.

[29]In reaching this finding, the Court does *not* determine how many occurrences have taken place. In moving for summary judgment in this regard, Plaintiffs argued that the Underlying Litigation involved a single occurrence.    Dkt. No. 97-1 at 20-23.    It is, thus, unnecessary for the Court to determine how many occurrences the Underlying Litigation involves.    It is simply enough to say that it involves more than one.

to support that contention.   If they are arguing that language in the Second Policies means there is a lack of coverage here, they cite no such language.   If they are making some other argument, the Court cannot discern it.   As such, for purposes of the second motion for partial summary judgment, the Court DENIES the same with respect to this argument.[30]

## CONCLUSION

For the reasons set forth herein, the Court:

(1) GRANTS the first motion for partial summary judgment, Dkt. No. 95;

(2) DENIES the cross-motion for partial summary judgment, Dkt. No. 116;

(3) GRANTS IN PART and DENIES IN PART the second motion for partial summary judgment, Dkt. No. 97;

(4) GRANTS the motion for joinder, Dkt. No. 128; and

(5) DENIES AS MOOT the ex parte motion to shorten time, Dkt. No. 154.

IT IS SO ORDERED.

DATED: May 2, 2022 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

[30]Should Plaintiffs wish to clarify this argument, in doing so, they may not (1) submit any evidence not already in the record, or (2) exceed a limitation of five (5) pages.